UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIA D. CLIFTON-DRAPER,
GEORGE E. DRAPER, and
BRITELYT, INC.,

    Plaintiffs/Counter-Defendants,

v.                                                 CASE NO. 8:10-cv-822-T-23AEP

PELAM INTERNATIONAL, LTD.,
and JONAS TAURECK,

    Defendants/Counter-Claimants.
_____/

**ORDER**

In April, 2010, Julian D. and George E. Draper and Britelyt, Inc., sued (Doc. 1) Jonas Taureck and Pelam International, Ltd., for patent infringement and for violation of the Sherman Act. The complaint alleges in the infringement count that the Drapers own United States Patent Nos. 6,863,526 and 6,887,071 and that Britelyt markets and sells products patented under the '526 patent and the '071 patent. The infringement claim alleges in generic terms that the defendants have "infringed . . . at least one of the claims of the '071 patent" and "infringed . . . at least one of the claims of the '526 patent" and that in each instance the infringement is "deliberate, willful, wanton, and with full knowledge and awareness . . . ."

The defendants move (Doc. 48) under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), for a construction of the disputed claim terms in the patents. Each party submits a brief and a response on claim construction (Docs. 48, 53, and 55). The parties agreed to a telephonic *Markman* hearing, which occurred on January 16, 2013.

The plaintiffs concede (Doc. 53) the invalidity of Claims One through Five of the '071 patent and withdraw any allegation of infringement of Claim Six in both the '526 patent and the '071 patent. Because each patent includes only six claims, the plaintiffs' remaining allegation is infringement of Claims One through Five of the '526 patent. Accordingly, in response to an order (Doc. 75), the parties have filed a claim construction chart (Doc. 76) that reduces the claim disputes (1) to the terms "lantern," "fuel system," and the "beveled seat" in Claim One and (2) to similar language in Claims Two through Five.

## SOME PRINCIPLES OF CLAIM CONSTRUCTION

The parties agree generally on the governing claim construction principles, expounded authoritatively in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005). *See generally* 5A *Chisum on Patents*, § 18.03[2][c]; 1 *Moy's Walker on Patents*, §§ 4:32-4:49. The frequently invoked and now thoroughly familiar themes of *Phillips*, to the extent pertinent to the present controversy, are distilled from *Phillips* as follows.

The claim of a patent defines the patented invention. The words of a claim mean what a person of ordinary skill in the art in question understood the words to mean on the effective filing date of the patent application.* The understanding of a person of ordinary skill in the art with respect to a disputed claim term is determined, first, by the words of the claim, by the remainder of the specification, and by the prosecution history and, second, if necessary, by extrinsic evidence of scientific principles, by the meaning of technical terms, and by the then-current state of the art. *See Phillips*, 415 F.3d at 1312-14.

The context of a term both in the asserted claim and in other claims of the patent in question is highly instructive because a claim is part of a fully integrated written instrument, a patent, which consists principally of a specification that concludes with a claim. For that reason, the specification, of which the claim is a part, informs the reading of the claim. The specification, always pertinent to claim construction, is usually dispositive and is the best guide to the meaning of a disputed term. Because the statute requires the specification to describe the claimed invention fully, clearly, concisely, and exactly, the specification necessarily informs the proper construction of a claim. *See Phillips*, 415 F.3d at 1314-16.

---

* The parties respectively submitted a paper (Docs. 77 and 78) addressing the definition of "a person of ordinary skill in the art" in the context of the present dispute. The parties agree generally that "a person of ordinary skill in the art" is a person with a high school diploma and either work experience or academic courses that familiarize the person with the principles and operation of a liquid fuel lantern. The parties identify no issue in this claim construction that depends on the definition of "a person of ordinary skill in the art" or that differs in result based on any difference between the parties' respective definitions.

The specification may reveal (as occurs, most tellingly, in the present dispute) a special definition, an intentional disclaimer, or a disavowal of claim scope by the inventor. In each instance, the inventor's words in the specification convey the inventor's objective intent and inform the scope of the claim. A claim must conform to the invention disclosed in the remainder of the specification, and the terms and phrases of the claim require clear support or antecedent basis in the description so that the meaning of a term in a claim is discoverable in the description. *See Phillips*, 415 F.3d at 1316-17.

Although relying heavily on the written description, claim construction may include the patent's prosecution history, which reveals the Patent Examiner's and the inventor's understanding of the patent. The patentee creates the prosecution history, like the patentee creates the specification, to explain the invention and to obtain the patent. Although perhaps lacking the useful clarity of the specification, the prosecution history often informs the meaning of a claim by demonstrating the inventor's understanding of the invention and revealing any limitation assigned (whether tactically or otherwise) to the invention by the inventor during the prosecution. *See Phillips*, 415 F.3d at 1317.

Extrinsic evidence, that is, the evidence external to the patent and the prosecution history, includes expert and inventor testimony, dictionaries, and learned treatises. Although usefully explaining the relevant art, extrinsic evidence is

less significant than the intrinsic record in determining the legally operative meaning of claim language. *See Phillips*, 415 F.3d at 1317.

*Phillips* avowedly undertakes to resolve "the role of the specification in claim construction," which *Phillips* concedes has lingered as "an issue in patent law . . . for nearly two centuries." *Phillips*, 415 F.3d at 1312. A review of the decisions after *Phillips* confirms that the issue of claim construction stubbornly persists. 1 Robert A. Mathews, *Annotated Patent Digest* §§ 5:54, 5:54.50, 5:55, 5:55.50, 5:56, 5:56.50, 5:56.75.

To note the persistence of controversy and difficulty in claim construction is not to fault *Phillips* or the *en banc* opinion's authors. The composition and construction of a patent claim, the fruits of which exist in the marketplace athwart other patent claims and their fruits, presses the capacity of the English language at least precariously near the outer boundary. Further, an attempt to prescribe a comprehensive and unvarying regimen of claim construction encounters intractable resistance; the boundless variation in the subject of, and the composition of, patents resists the prescription of a governing principle that is at once both uniform and salutary. This inherent frailty is aggravated by the forceful persistence of sometimes sophistic legal minds that aspire to obscure, finesse, and evade. The clumsy and arcane antiquity of claim language richly deserves acknowledgment as a contributing culprit, as well. The tenacity of confounding terms in patents evokes the observation

that the seductive comfort of opaque language is the last redoubt of an "expert" exposed.

**THE "LANTERN" AND THE "FUEL SYSTEM" ISSUES**

The '526 patent is a continuation-in-part of the '877 parent patent, (1) which states that "the present invention relates to a lantern and fuel system . . . to safely and conveniently use a liquid fuel to provide heat and light," (2) which issued in 2004 with ten claims, and (3) which cites "crowded prior art" ('877, Col. 1, l. 20) comprising twenty-nine patents, both United States (twenty-five of the twenty-nine) and foreign, between 1911 and 2002.  Claim One of the '877 patent claims a device comprising "a lantern and fuel system for allowing a user to safely and conveniently use a liquid fuel to provide heat and light, . . . comprising . . . a fuel tank . . . a pressure gauge . . . [several other components] . . . [and] a quantity of liquid methanol to be used as a fuel." ('877, Col. 9, l. 14 – Col. 11, l. 44)  Claim Two of the '877 patent includes "a quantity of liquid methanol to be used as a fuel."  ('877, Col. 12, l. 22)  Claims Three through Ten of the '877 patent include "a lantern and fuel system as described in claim 2."  ('877, Col. 12, l. 22 – l. 47)

The specification of the '877 patent confirms that "[a] quantity of liquid methanol is used as a fuel."  ('877, Col. 3, l. 53 and 54)  Also, the specification states that "still another object of the present invention" is "to provide a lantern and fuel system and method for allowing a user to safely and conveniently use a liquid fuel to

provide heat and light." ('877, Col. 4, l. 34 – l. 37)  The specification soon adds, "The fuel is a quantity of liquid methanol." ('877, Col. 4, l. 53)  The "background" of the invention in the '877 patent states that "the present invention substantially departs from the conventional concepts and designs of the prior art" by disclosing a device that permits "a user to safely and conveniently use a liquid fuel to provide heat and light." ('877, Col. 1, l. 39 – l. 43)  The patent discloses prior art that includes a kerosene lantern and a gasoline lantern but not a methanol lantern.

The patent-in-suit, the '526 continuation-in-part patent, includes (slavishly recites) the subject matter of the parent '877 patent and adds a new drawing and several new paragraphs dedicated to a description of the "pump subassembly." Claim One of the '526 patent claims "a lantern having [several components] and a fuel system with a pump subassembly . . . ."  Claim Two of the '526 patent claims "a lantern having [the same components as Claim One] and a fuel system with a pump subassembly . . . ."  Each of Claims Three, Four, and Five of the '526 patent claim "[t]he system as set forth in claim 2 wherein [each claim states a singular characteristic of the claimed O-rings]."  Although each claims a "fuel system," none of Claims One through Five of the '526 patent expressly identifies a fuel by name, by state (solid, liquid, gas), by characteristic, or by other means.  (Claim Six, no longer at issue, mentions only "a liquid fuel" ['526, Col. 10, l. 55] and "a quantity of combustible liquid." ['526, Col. 14, l. 8])

The construction of the first five claims of the '526 patent immediately implicates the "longstanding difficulty" mentioned in *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1117 (Fed. Cir. 2004), "the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification." Quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904-905 (Fed. Cir. 2004), *Innova/Pure Water* notes "the 'fine line' and 'inherent tension' attending the question presented by these axioms." *Innova/Pure Water*, 381 F.3d at 1117.

In the present dispute the "inherent tension" begins with the plaintiffs' assertion that the term "lantern" in Claims One through Five of the '526 patent is a "lantern" in a sense understood in common usage (more particularly, the plaintiffs assert that someone ordinarily skilled in the art would read the term "lantern" consistent with common usage among laymen), that is, "a device for providing heat or light" by using a liquid fuel. In response, the defendants invite an inquiring look at the specification and proffer that the term "lantern" means "a methanol-only" lantern.

The "background" of the '526 patent in describing the "field of the invention" states that "the present invention" allows "a user to safely and conveniently use a liquid fuel to provide heat and light." ('526, Col. 1, l. 14 and l. 15)  In the "description of the prior art" the '526 patent states that "the present invention

substantially departs" from the prior art by providing safe and convenient means to use "a liquid fuel to provide heat and light." ('526, Col. 1, l. 40 – l. 44) In the "summary of the invention," after seventeen paragraphs describing the components of the invention, the patent states, "A quantity of methanol is used as a fuel." ('526, Col. 3, l. 64 and l. 65)

In the last sentence ('526, Col. 8, l. 41 and l. 42) of the "description of the preferred embodiment" the patent states, "Lastly, a quantity of liquid methanol is provided. The methanol is used as a fuel." ('526, Col. 8, l. 41 and l. 42)  In short, the expression of the "preferred embodiment" discloses only methanol as a fuel, and nothing in the specification, including the claims, discloses any fuel except methanol (nor a distinct means to employ a fuel other than methanol).

The patent immediately turns to alternative embodiments and, in the next three paragraphs describes three alternative (the patent erroneously says "alternate") embodiments, none of which discloses either additional information about the liquid fuel or proposes an alternative fuel. ('526, Col. 8, l. 43 – l. 62)

The patent again shifts from the preferred embodiment and alternatives to "the disclosure" (plaintiffs' counsel concedes that "the disclosure" is the disclosure of the preferred embodiment), and states:

> The disclosure hereby provides a disclosure of a system which provides
> an environmentally enhanced fuel, lighting and cooking system
> comprised of a particular fuel with one oxygenated carbon atom as
> well as a disclosure of a mantle lantern designed with a particular air

> fuel ration [sic] capability that is designed to vaporize, preheat and partially disassociate the methanol fuel.

('526, Col. 8, l. 63 – Col. 9, l. 2) Next, the description shifts abruptly once again to "an alternative configuration" ('526, Col. 9, l. 3) and briefly discloses a mixture of methanol "with a 40 percent solution of trimethylamine in 60 percent water" to produce a "distasteful" solution that will "prevent the use of methanol as a drinking solution."

The next paragraph of the patent begins with the introductory phrase "also included." Although the paragraph fails to expressly state to what earlier entry this "also included" paragraph alludes, the best reading confirms (and the plaintiffs' counsel concedes) that "also included" ('526, Col. 9, l. 8) adds another particular to "the disclosure," which in turn discloses the "preferred embodiment." The "also included" paragraph adds:

> Also included is a method for utilizing **Methanol** as a fuel for lanterns, heaters and stoves. The first step of the method is providing a quantity of **methanol**. The next step is providing a reservoir for holding the **methanol** available for use. The next step is providing a pressurizing means of the **methanol** reservoir to produce a driving force to move the **methanol** toward the place of ignition. The next step is providing a pre-ignition system for vaporizing the **methanol** to provide a means for consistent burning. The next step is providing a structural means to vaporize **methanol** and preheat the vapors allowing for consistent burning. The next step is providing a vapor metering needle valve for the dispersing of vaporized **methanol** for consistent and continued **methanol** burning. The final step is providing a mantle for containing the flame from the burning of the vaporized **methanol**, for ensuring consistent and continued **methanol** burning.

(emphasis added)

The concluding sentence of the just-quoted paragraph promises a "final step" providing "a mantle for containing the flame from the burning of the vaporized methanol," and the first half of the following paragraph ('526, Col. 9, l. 24 – l. 42) delivers on that promise and concludes with the most telling description in the patent:

> A modified pressure incandescent mantle lantern-fuel system operating on a highly selected fuel, namely a primary alcohol having no carbon atom not attached to oxygen, such that the lantern gives no [sic] only a fuel efficiency to light about 50 percent higher than any lantern on any previously used fuel, but also highly superior safety and operating ease at levels not before seen including lightability without pressure, these benefits being due to the use of high vapor superheat and a carefully regulated air fuel ratio followed by further heating of the air-fuel mixture so as to disassociate same, **possibly** [sic] **only because of the selection of a unique fuel** that can be disassociated at temperatures generated and utilized by our modified lantern, **and so constructed that it will only operate on the selected fuel (methanol) which heretofore has not been used in pressure mantle lanterns**, the lantern-fuel system being uniquely interdependent int hat [sic] **the lantern will not operate properly except on methanol and methanol is not usable in any other mantle lantern**.

(emphasis added) By this paragraph the inventor discloses a "unique fuel," a disclosure that, even if nothing more were said, means – perforce the word "unique" – that the inventor discloses for this invention one and only one fuel and eschews each and every other fuel (undoubtedly, methanol is not "unique" to the world, only to the lantern). The English language offers no word that, more thoroughly than "unique," effects in the mind of the reader the absolute and unmistakable exclusion of every item other than a specified item. The inventor discloses that the invention is "possibl[e] [the patent says "possibly," another obvious misspelling] only because of the selection of the unique fuel." The inventor further

- 11 -

claims that the disclosed lantern is "so constructed that it will only operate on the selected fuel (methanol)." (Presumably, "only operate on the selected fuel" intends "operate only on the selected fuel," "operate on only the selected fuel," or, better still, "operate on the selected fuel only.") To recapitulate, the inventor discloses that the invention employs a "unique fuel," that the invention is "possible" only because of the "unique fuel," and that the invention is designed to operate on this "unique fuel" only, which fuel the inventor identifies repeatedly and unconditionally and boastfully as methanol, described in the '526 patent also as "a particular fuel with one oxygenated carbon atom" ('526, Col. 8, l. 65) and "a primary alcohol having no carbon atom not attached to oxygen." ('526, Col. 9, l. 26) (The plaintiffs' counsel concedes that these two descriptions identify only methanol.)

The second half of the same paragraph (1) describes the "co-generation mode" of operation that permits use of heat from the lantern for cooking and (2) describes the environmental advantages of the lantern's high combustion efficiency ("soot and polyaromatic hydrocarbon formation being absolutely impossible"). The last sentence ('526, Col. 9, l. 56 and l. 57) in this paragraph – after two long paragraphs describing "a method for utilizing Methanol as a fuel for lanterns" and describing a "modified pressure incandescent mantle lantern-fuel system operating on a highly selected fuel" – constitutes a statement central and critical to any patent that contains the statement. The sentence, situated tellingly between the claims and the balance of the specification, declares, "It will be seen from the foregoing that the invention

resides in the fuel-lantern integration." In this sentence the inventor provides his definitive statement of his precise invention, which is the "fuel-lantern integration" (hyphen in the original). What fuel? The "unique" fuel, the only one disclosed, methanol. What lantern? A lantern "so constructed that it will only operate on the selected fuel (methanol)."

*Honeywell International, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006), defines a "fuel filter" as the patented invention because the inventor describes a "fuel filter" as "this invention" and "the present invention" in the written description. *Honeywell* memorably concludes, "The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Honeywell*, 452 F.3d at 1318.

The statements in the written description of the '526 patent command, as strongly or more strongly than those in *Honeywell,* that the invention disclosed in the '526 patent is a lantern fueled by methanol only. As clearly as words permit, the inventor in the '526 patent has specially defined methanol as the "unique" fuel for the invention, has expressly and intentionally disclaimed – because infeasible – any other fuel for the invention, and has overtly disavowed any claim to a lantern using a fuel other than methanol. These words of the inventor in the patent convey the inventor's objective intent and inform the meaning of the words in the claim. In sum, the inventor is taken at his word; the "fuel" is methanol only and the lantern is a

- 13 -

"methanol-only" lantern.  Any other result deprives the words of the specification and the words of the claim of both meaning and integrity.

The defendants highlight in their papers that, based on non-statutory double patenting, the Patent Examiner rejected the as-filed claims of the '526 patent.  The Patent Examiner observes (Doc. 48-5), for example, that Claim One of the parent '877 patent and Claim One of the application resulting in the '526 patent differ only because the '877 patent includes "methanol as the quantity of combustible liquid" and the application includes the "more broadly recited 'a quantity of combustible liquid to be used as the fuel'" (the former obviously anticipating the latter, if patented).  This observation by the Patent Examiner and the defendants, although informative, is less influential to claim construction in this instance than the inventor's choices in the patent.  The inventor states in the specification that the lantern uses a "liquid fuel," that only methanol will operate the invention, and that only by using methanol is the invention "possible," but simultaneously the inventor includes in Claims One through Five of the '526 patent, with respect to the fuel, only the phrase "a fuel system."

The issue of claim construction resolved in this section of this order is not to what extent or when or how or whether in this instance one interprets a claim in light of a specification or to what extent or when or how or whether in this instance a claim is immune from a limitation's importation from the specification.  Stated more precisely and more manageably, the issue in this instance is how to interpret a patent

- 14 -

that includes a specification that positively asserts a pointed fact about the invention, that is, that methanol is the "unique" fuel of the invention, but later includes a claim that employs a more generic term that, without reference to the pointed fact in the specification, allows literally for a liquid fuel other than methanol.  Stated from a more clarifying vantage, the issue is this:  If "fuel" as used in the claims means methanol only, both the specification and the claim are meaningful and truthful (even though the claim is suggestively and mischievously generic).  If "fuel" as used in the claim includes fuels other than methanol, the specification contains a material deception (a series of deceptions, actually) about the invention and methanol.  Will the law construe a patent in a manner that bestows a benefit on a patentee by condoning deception (or, at least, duplicity) or will the law construe a patent in a manner that renders the patent uniformly forthcoming and transparent?  Thus formulated, the question answers itself.  A claim may reach more broadly than the specification (and the specification cannot limit the claim) but, if the claim – broadly construed – stands athwart the specification, a claim's construction is informed by the specification and, if possible, construed to accord with the specification.  Thus are the rules of *Phillips* observed closely and applied carefully in this instance.

## THE BEVELED SEAT ISSUE

Finally, the parties dispute the meaning of the term "beveled seat." Claim One of the '526 patent claims:

> A lantern having a mantle, a chimney, an ignition bowl, and a fuel system with a pump subassembly, the pump subassembly adapted to facilitate the forming of a tight seal in the system during pumping, the pump subassembly including **a beveled seat having an interior end with a cylindrical configuration constituting an interior guard with a first O-ring on the beveled seat adjacent to the interior guard, the beveled seat having an exterior end with a cylindrical configuration constituting an exterior guard with a second O-ring on the seat adjacent to the exterior guard,** and an intermediate guard on the seat between the first O-ring and the second O-ring, the first and second O-rings being fabricated of an elastomeric material with an essentially common diameter, the interior and intermediate guards being spaced an essentially common first distance from the first O-ring and the exterior and intermediate guards being spaced an essentially common second distance from the second O-ring and with the second distance being less than the first distance.

('526, Col. 10, l. 13 – l. 31) (emphasis supplied)

Claim Two of the '526 patent claims:

> A lantern having a mantle, a chimney, an ignition bowl, and a fuel system with a pump subassembly, **the pump subassembly including a beveled seat** having an interior end with a cylindrical configuration constituting an interior guard with a first O-ring on the seat adjacent to the interior guard, the **beveled seat** having an exterior end with a cylindrical configuration constituting an exterior guard with a second O-ring on the seat adjacent to the exterior guard, and an intermediate guard on the beveled seat between the first O-ring and the second O-ring, the intermediate guard being spaced closer to the exterior guard than the interior guard.

('526, Col. 10, l. 32 – l. 43) Claims Three through Five of the '526 patent claim the same "beveled seat" included in Claim Two.

Essentially, the parties' dispute is whether the "beveled seat" means only the conical, angled portion of the pump subassembly or whether the "beveled seat" includes the entire structure displayed in Fig. 3A on Sheet 4 of the drawings in the '526 patent and marked as item 54 in Fig. 3 on Sheet 3 of the drawings in the '526 patent.

The plaintiffs claim, "The specification plainly states that the 'beveled seat 56' is the entire end of the pump." (Doc. 53 at 41) To "prove" this position, the plaintiffs cite part of the description in the second complete paragraph in Column 6 of the '526 patent. Including the part cited by the plaintiffs (and more), the pertinent part of Column 6 of the '526 patent states:

> A pump subassembly **44** is next provided. The pump subassembly has a shaft **46** with an upper end **48** and a lower end **50**. The upper end has a gripping handle **52**. The lower end has a pump portion **54** with a beveled seat **56** and an O-ring **58** associated thereto to provide a seal for pumping. . . .
>
> The pump subassembly includes a beveled seat **56** having an interior end with a cylindrical configuration constituting an interior guard with a first O-ring **58** on the seat adjacent to the interior guard. The beveled seat has an exterior end with a cylindrical configuration constituting an exterior guard **304** with a second O-ring **308** on the seat adjacent to the exterior guard. The beveled seat has an intermediate guard **300** on the seat between the first O-ring and the second O-ring.

The specifications' reference to the drawings, in this instance, usefully clarifies the meaning of "beveled seat." 5A Donald S. Chisum, *Chisum on Patents*, § 18.03[2][c][ii] n.565 (and cases cited). The object depicted in Figure 3 of the drawings in the '526 patent is item 44, the pump subassembly. The description

clarifies in the first full paragraph of Column 6 of the '526 patent that the "pump subassembly" includes a shaft with an upper and lower end, the upper end including a "gripping handle" and the lower end including the "pump portion." Figure 3 illustrates lucidly the description of the pump subassembly. So, in sum, the lantern has a pump subassembly (item 44), which has a pump portion (item 54), which has a beveled seat (item 56). Again, item 54 of Figure 3 is the "pump portion," which includes item 56, the "beveled seat."

Close inspection of Figures 3 and 3A of the '526 patent confirms that the lead line from item 56 leads in each drawing to, and then onto, the diagonal line in the conical, angular part of the depicted object. The lead line from item 56 neither points toward nor contacts any of the "guard" structures in either drawing or any of the O-rings in either drawing. However, inspection of item 54 in Figure 3 of the '526 patent reveals a lead line with an arrow at the end of the lead line but with the arrow (of course) withdrawn at some distance from the object depicted. As stated in the *Manual of Patent Examining Procedure* § 608.02(V)(r), which contains "drawing standards" for patent applications, "Arrows may be used [in a drawing] at the ends of lines, provided that their meaning is clear, as follows: (1) On a lead line, a freestanding arrow to indicate the entire section toward which it points . . . ."

In Figure 3, four of the lead lines have an arrow, each withdrawn at some distance from the object depicted. In each instance (twice in item 4, once in item 44,

and once in item 54) and in accord with the *MPEP*, the lead line with an arrow conveys a more expansive reference, a reference that encompasses "the entire section to which it points," a reference broader than a lead line that has no arrow and that contacts the lines of the object depicted. In other words, in Figure 3, item 54 identifies the "pump portion" consisting of "guards" (two in Figure 3), an O-ring (one in Figure 3), and the conical, angular "beveled seat," which is intimately identified in Figure 3 by a lead line from the angular beveled seat to item 56. If, as the plaintiffs claim, the "beveled seat" meant the guards plus the O-rings plus the conical, angular beveled seat, item 54 in Figure 3 would say "beveled seat" and not "pump portion," and item 56 would say something else or, having nothing to say, not exist.

If the entire object depicted in Figure 3A were the "beveled seat" and not a detail of the "pump portion," which it is, item 56 in Figure 3A would stand at some distance from the object depicted, would include an arrow at the end of the lead line, and would not touch the lines of the object depicted. In fact, similar to each item in Figures 3 and 3A, item 56 in Figure 3A has no arrow, touches the lines of the angular and conical portion of the pump section, and precisely and unmistakably identifies the angular and conical section as the "beveled seat."

As the defendants contend, the "beveled seat" is the angular and conical portion of the pump portion exclusive of the guards. Any other interpretation

deprives these drawings of meaning and derivatively deprives the specification and the claims of meaning.

## CONCLUSION

The motion (Doc. 48) for claims construction is **GRANTED**. In sum, in the disputed claims, "lantern" means "a methanol-only lantern," "fuel" means "methanol" and "fuel supply" accordingly means "methanol supply," and "beveled seat" means "the angular and conical section of the 'pump portion,' exclusive of the guards."

## NOTICE

On or before **February 15, 2013**, either the plaintiffs or the defendants in a paper not to exceed seven pages and containing citation of authority, if pertinent, may object to this *Markman* order by identifying any error of fact or law or any omission, misstatement, oversight, or the like (including any meaningful typographical error). Neither party may respond to the other's paper unless so ordered.

ORDERED in Tampa, Florida, on February 1, 2013.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE