UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIA D. CLIFTON-DRAPER,
GEORGE E. DRAPER, and
BRITELYT, INC.,

    Plaintiffs,

v.                                                        CASE NO. 8:10-cv-822-T-23AEP

PELAM INTERNATIONAL, LTD.,
and JONAS TAURECK,

    Defendants.
_____/

**ORDER**

    Julia Clifton-Draper, George Draper, and BriteLyt sue (Doc. 1) Pelam International and Jonas Taureck and allege two counts. In Count One the plaintiffs allege patent infringement. The plaintiffs eventually relinquished elements of their original infringement count,[*] and a *Markman* order (Doc. 87) construes the disputed patent claims in favor of the defendants. The defendants move (Doc. 89) for

---

[*] The plaintiffs conceded (Doc. 53) the invalidity of Claims One through Five of the '071 patent and withdrew any allegation of infringement of Claim Six in both the '526 patent and the '071 patent. Because each patent includes only six claims, the plaintiffs' remaining allegations of infringement involved only Claims One through Five of the '526 patent. In response to an order (Doc. 75), the parties filed a claim construction chart (Doc. 76) that reduced the claim disputes (1) to the terms "lantern," "fuel system," and "beveled seat" in Claim One and (2) to similar language in Claims Two through Five. The *Markman* order (Doc. 87) resolves each claim construction dispute.

summary judgment on the balance of the infringement count, and the plaintiffs in response concede that the *Markman* order, which finds that the patent claims only a methanol lantern, effectively defeats the infringement count. As the plaintiffs state in responding to the motion for summary judgment:

> [T]he Plaintiffs would concede that there is no infringement, in that it is not believed that the Defendants make or sell a methanol lantern.

(Doc. 90 at 2) Because the record presents no genuine issue of material fact on the infringement count (Doc. 1 at 6-8), the defendants are entitled to judgment as a matter of law on Count One.

The plaintiffs' Count Two alleges a violation of the Sherman Act. Taureck answered and asserted affirmative defenses. (Doc. 17) Pelam answered, asserted affirmative defenses, and counterclaimed. (Doc. 16) (The counterclaims seek a declaration of non-infringement of the '056 and '071 patents, a declaration of invalidity of the patents, and a declaration of unenforceability of the patents.) The defendants move (Doc. 89) for summary judgment on the Sherman Act count. The plaintiffs respond in opposition. (Doc. 90)

### The Allegations of the Sherman Act Count

For several years before June 4, 2009, Silver-Ray Kaiping, a Chinese corporation, sold to the plaintiffs lanterns, cook stoves, and lantern parts, which BriteLyt re-sold. In October, 2006, BriteLyt applied for the mark "Petromax," the registration of which Pelam inadvertently permitted to expire. Pelam opposed

BriteLyt's application for the mark, and the Trademark Trial and Appeals Board began resolution of the dispute.

The complaint alleges (Doc. 1 at 8-11) that a May 14, 2009, letter, attached to the complaint as Exhibit E, from Pelam's counsel, Deborah A. Wilcox at Baker Hostetler in Cleveland, Ohio, to BriteLyt's counsel, Edward P. Dutkiewicz in Dade City, Florida, "threatened BriteLyt with financial ruin" and "attempted to coerce BriteLyt and the Drapers into forfeiting any rights to the Petromax mark." After discussing Pelam's continuing common law right to the mark "Petromax" and after expressing disappointment with BriteLyt's continued claim to the mark, Wilcox's letter on behalf of Pelam states:

> You should also be aware that, irrespective of the outcome of the opposition proceeding and of further proceedings which Pelam may elect to initiate, Pelam has other means at its disposal to protect its rights in the PETROMAX mark. Pelam has the right and ability to control its manufacturer Kaiping and the distribution of the authorized product. Unauthorized sales to BriteLyt will not be tolerated. In addition, BriteLyt's unauthorized use of the PETROMAX "Dragon" design, for which Pelam owns a pending U.S. application and numerous registrations around the world, could render BriteLyt liable for additional acts of infringement and unfair competition.

The letter concludes with an invitation for BriteLyt "to cooperate with Pelam in this matter" and to discuss the prospect for BriteLyt and Pelam "to penetrate the U.S. market through a strategic and mutually beneficial business relationship [that] would undoubtedly produce a favorable result for both parties." No reconciliation occurred.

On June 4, 2009, BriteLyt received from Lin Gen Sheng at Kaiping an e-mail, attached to the complaint as Exhibit F, that informs BriteLyt of "a change in our distribution channel structure." Specifically, Sheng informs BriteLyt that "henceforward" Pelam would exclusively distribute Kaiping's products and that Kaiping would no longer sell products, even "nonbranded lantern products," to BriteLyt. Kaiping instructed BriteLyt to inquire about any further purchases by "directly" contacting Pelam in Magdeburg, Germany. The complaint alleges "on information and belief" that "Pelam ordered Kaiping to cease selling" to BriteLyt "by threatening to refuse to purchase any products from Kaiping."

Later in 2009, Pelam withdrew with prejudice the opposition to BriteLyt's application for the "Petromax" mark, which the Patent and Trademark Office issued to BriteLyt in October, 2009. BriteLyt alleges in the complaint that the June, 2009, e-mails, attached to the complaint as Exhibit H, between the Drapers and Taureck "attempted to coerce the Plaintiffs in to surrendering their property rights to their registered trademark 'Petromax.'" The first e-mail, a June 17, 2009, e-mail from Taureck to the Drapers, states that Pelam and Kaiping "have reached a common understanding . . . safeguarding non-disclosure of [Pelam's] confidential business secrets" and confirms that Pelam remains "interested in supplying you with Petromax lanterns and lantern parts" and "supplying you with sales and marketing strategy." The e-mail further expresses that, despite "errors regarding the ownership of the Petromax brand," "the international image of Petromax needs to be

standardized," and that "our distributors need to dispread [sic] being the owner of the Petromax mark in the U.S." The e-mail concludes that:

> This will come along with a transfer of the U.S. Petromax trademark and the Petromax.com domain name.
>
> After clarification of the status of the brand, we would be pleased to negotiate the details of a contract with you and furthermore offer our help to enable you to penetrate the U.S. market.

Exhibit H includes Diane Draper's responsive e-mail, which states:

> It has been brought to my attention that you now have a contract "and control" of Kaiping Silveray Metal and Plastics, Ltd., and that, as per Kaiping Silveray Metal and Plastics, all pressurized lanterns, parts, etc. must be purchased direct from Pelam International, including the BriteLyt Multi-Fuel pressurized lanterns and parts.
>
> Please send copy of this above said contract, and all information pertaining to the wholesale pricings, as we must have detailed information, in order to prevent any disruption of our regular business obligations/duties.
>
> I would also request that you send written documentation, insuring BriteLyt, Inc. that it will receive fair pricing from Pelam International, and that Pelam International has not entered into a malicious act, in securing "control" of Kaiping Silveray Metal and Plastics, Ltd., to cause any harm, disruption of business, or if your actions are to create disruption of business solely directed towards BriteLyt, Inc.
>
> I would appreciate your prompt reply.
>
> Thank you and God bless!

These factual allegations pertinent to BriteLyt's Sherman Act count appear in paragraphs beginning with paragraph 24 on page 8 of the complaint and including the paragraphs following paragraph 24, which are erroneously numbered as paragraph 21 through paragraph 29 on page 9. Following paragraph 29 on page 9

and continuing to the top of page 11 are allegations, each conclusory in form, that "Pelam enjoys a substantial market share, in the sale of lanterns such as those which had been sold by BriteLyt," that "[u]pon information and belief, there are no other competitors of Kaiping or Pelam who produce a lantern which is the same or similar to that which BriteLyt had purchased from Kaiping," that "Pelam has caused Kaiping to refuse to continue to provide lanterns to BriteLyt," and that the "anti-competition arrangement," which has no "legitimate business purpose," has a "direct, substantial, and reasonably foreseeable detrimental effect" that "continues to financially damage BriteLyt and the Drapers."

The final page and a half of the complaint (Doc. 1 at 12-13) contains the plaintiffs' request for relief. Sub-paragraph (B) on page 12 states precisely the relief that the plaintiffs request on the Sherman Act count:

> Permanently enjoining Defendant and its principals, shareholders, officers, directors, employees, successors, assigns, suppliers, agents, servants, and attorney, and all those persons in active concert, participation or privity with them, or any of them from engaging in activities including *vertical anti-competitive contracts*, which would suppress competition, in violation of 15 U.S.C. § 1 et seq.

(emphasis added)  Sub-paragraph (D) includes a demand under 15 U.S.C. § 15 for damages, including treble damages.

### The Motion for Summary Judgment on the Sherman Act Count

In the seven pages (Doc. 89 at 14-21) of their motion for summary judgment and memorandum of law dedicated to the plaintiffs' Sherman Act count, the

defendants principally and correctly argue (1) that the plaintiffs allege, at best, only a vertical restraint of trade that is not *per se* illegal and that is subject to the "rule of reason," (2) that the plaintiffs have failed to establish, as required under the "rule of reason," an anti-competitive effect on the relevant market as a result of the alleged imposition by the defendants of an unlawful restraint of trade, (3) that the plaintiffs have failed to negate, as required under the "rule of reason," that the pro-competitive effect of the alleged restriction outweighs any anti-competitive effect in the relevant market, (4) that the plaintiffs have failed to submit admissible evidence, including any expert evidence, to define the relevant market, that is, the relevant product market and the relevant geographic market, with respect to which any alleged anti-competitive effect is measurable, and (5) that the plaintiffs have failed to present admissible evidence of the financial condition of BriteLyt either before or after the alleged imposition by the defendants of the unlawful restraint of trade.

The Plaintiffs' Response to the Motion for Summary Judgment

The plaintiffs begin the nine-page response (Doc. 90) on behalf of the Sherman Act count by denying that the complaint alleges a vertical restraint and by asserting for the first time that the complaint alleges a horizontal restraint, a group boycott, and price fixing. For example, on pages 7 and 8 of the response, the plaintiffs argue:

> [T]he plaintiffs contend that the facts as herein provided militate in favor of finding a horizontal arrangement, and the effective presence of price fixing, with Pelam having complete control over the market place pricing by virtue of its complete control of Kaiping.

> . . . .
>
> The horizontal arrangement between Reach Target, Kaiping, and
> Pelam, as distributors, coupled with the contract, between the three,
> which prevents any dealings between Kaiping and BriteLyt, constitutes
> the type of horizontal group boycott which is *per se* illegal.

Appearing after more than three years of litigation, after denial of a preliminary injunction, after an adverse decision on patent claim construction, and in response to a motion for summary judgment, the plaintiffs' attempt to shift the theory of the case is directly contrary to a fair reading of Count Two of the complaint, which includes a specific invocation of the term "vertical restraint" in the *ad damnum* clause on page 12 of the complaint but includes nowhere a mention of either "horizontal restraint" or "group boycott" or "price fixing."  Also, the plaintiffs' unsuccessful motion for a preliminary injunction (Doc. 25) includes allegations fairly understood to describe only a vertical restraint, and the "WHEREFORE" clause (Doc. 25 at 14) in the motion requests an injunction that prevents the defendants and others "from engaging in activities including vertical anti-competitive contracts, which would suppress competition in violation of 15 U.S.C. § 1 et seq."  The motion nowhere mentions either "horizontal restraint" or "group boycott" or "price fixing."

Attempting in the response to the motion for summary judgment to assert for the first time the existence of a horizontal and *per se* unlawful agreement and a group boycott, the plaintiffs nowhere respond meaningfully to the deficiencies identified by the defendants in the plaintiffs' vertical restraint count, although several of the

deficiencies are fatal to a vertical restraint count.  Perhaps the most telling and preclusive omission by the plaintiffs is the threshold failure to demonstrate, especially through expert assessment, the "relevant market," that is, the economically meaningful market within which the plaintiffs assert the requisite adverse effect from the defendants' alleged anti-competitive arrangement.  The relevant market is the intersection of the relevant product market and the relevant geographic market.

An assessment of the relevant product market typically includes a determination of the pertinent products within the market, the reasonable substitutes available, the view in the industry and among the public of the pertinent products, the salient characteristics of the products, the price of the products, the customers to whom the products sell, and the distributors and dealers that sell the products. Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* vol. IIB, ¶¶ 560-66, 357-417 (Wolters Kluwer 2007); *ABA Model Jury Instructions in Civil Antitrust*, C-6, Instruction 4 (American Bar Ass'n 2005).  (The defendants note that Pelam is a minuscule and inconsequential participant in the United States market and that Coleman, wholly unaffected by the alleged anti-competitive arrangement between Pelam in Germany and Kaiping in China, remains the dominant participant in the market – about all of which the plaintiffs say nothing.)

An assessment of the relevant geographic market typically includes an assessment, almost necessarily an expert assessment, of whether and of the extent to which a change in the price or the product offered in one geographic area has a

substantial effect on the price or sales in another geographic area.  If so and if to a sufficient extent, the cause and effect tend to show that one geographic area and another geographic area occupy the same relevant geographic market.  Among the facts contributing to a determination of the relevant geographic market are the geographic area in which the defendants sell and in which the defendants' customers are located; the geographic area to which customers turn, have turned, or have seriously considered turning for their supply of the product; the geographic area that suppliers view as potential sources of competition; and whether governmental licensing requirements, taxes, or quotas limit competition.  Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* vol. IIB, ¶¶ 550-56, 307-57 (Wolters Kluwer 2007); *ABA Model Jury Instructions in Civil Antitrust*, C-13, Instruction 6 (American Bar Ass'n 2005).

The establishment of a relevant market and a demonstration of an adverse effect on that market as a result of an unlawful arrangement are the irreplaceable *sine qua non* of a Sherman Act count of the sort alleged by the plaintiffs.  Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* vol. IIB, ¶¶ 531f, 236-42 (Wolters Kluwer 2007).  The plaintiffs' complete omission – from the complaint until this day – to address the relevant market (and, as detailed by the defendants, other essential elements) precludes the plaintiffs' Sherman Act count.

A Discussion of the Sherman Act Count

The facts alleged and the relief demanded in Count Two of the complaint notify the informed and objective reader that the plaintiffs attempt to allege an arrangement that constitutes a vertical restraint, subject to the "rule of reason" – an arrangement between a manufacturer and a purchaser of the manufacturer's product that excludes a former customer of the manufacturer from purchasing the manufacturer's product. Faced with a motion for summary judgment, the plaintiffs abandon the allegation of an unlawful vertical arrangement and without amending the complaint boldly assert for the first time in the response to the motion for summary judgment an arrangement that constitutes a *per se* unlawful horizontal restraint (obviously not subject to the "rule of reason"). This last-minute, evasive "pivot" by the plaintiffs is impermissible and is, accordingly, disallowed.

However, even if the evasive "pivot" is permitted, the result is the same. For the reasons amply explained by the defendants (and uncontested by the plaintiffs and, therefore, not needlessly expounded in this order), the plaintiffs have failed to allege or to support the predicates necessary to the invocation and exercise of a federal court's authority under the Sherman Act.

The plaintiffs captured in the conclusion of their response to the motion for summary judgment precisely their misunderstanding of their Sherman Act count. First, at page 9 of the response, the plaintiffs state, "The contract at issue [between Pelam and Kaiping] restrains trade in the United States by preventing the shipment

of Kaiping lanterns to the United States customer, Brite[L]yt." Apparently, the plaintiffs' equate a supplier's discontinuing them (however minuscule the effect in the relevant market), a loss of economic opportunity to them (however minuscule the effect in the relevant market), and the unavailability to them of a product (however minuscule the effect in the relevant market) as a "restraint of trade" within the prohibition of the Sherman Act. About that, the plaintiffs are fatally wrong. As the defendants note, the Sherman Act protects competition, not a competitor.

Next, at page 11 of the response, in answering the defendants' objection that the plaintiffs neither allege nor evidence any adverse effect on competition in a relevant market, as required under the Sherman Act, the plaintiffs emphatically assert, "The agreement [between Pelam and Kaiping] is not about competition. It is about extortion, and it is about revenge." Citing the letter from attorney Wilcox to attorney Dutkiewicz, the plaintiffs add, "The goal of the letter, and the threat, was to force BriteLyt to relinquish its claims to the trademark PETROMAX, and a web site address, www.petromax.com, to Pelam, which BriteLyt would not do." But the Sherman Act prohibits neither extortion nor revenge. The Sherman Act prohibits neither relinquishing nor retaining a trademark and prohibits neither relinquishing nor retaining a web address. The Sherman Act invokes a specific and special genre of federal regulation and requires the pleading of, and proof of, certain essential elements, several of which, as the defendants demonstrate, the plaintiffs not only fail to plead and prove (or even proffer) but affirmatively and dismissively reject. Central

to that failure is the omission to plead, and offer evidence of, both the relevant market and an unlawful effect on that market arising from the contract between Pelam and Kaiping.

For these reasons and the other reasons explained by the defendants in the motion for summary judgment (and unrebutted by the plaintiffs), the record presents no genuine issue of material fact, and the defendants are entitled to judgment as a matter of law on Count Two.

## Conclusion

The defendants' motion for summary judgment (Doc. 89) is **GRANTED**. The clerk is directed (1) to enter judgment for the defendants and against the plaintiffs on each of the two counts of the complaint, (2) to enter judgment for the defendants and against the plaintiffs on Count One of the counterclaim, (3) to enter judgment of dismissal for mootness as to Count Two and Count Three of the counterclaim, and (4) to close the case.

ORDERED in Tampa, Florida, on October 11, 2013.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE